**UNITED STATES of America**

v.

**Donald GREEN, a/k/a "Sly," "Stone;" Darryl Johnson, a/k/a "Reese;" Derwin Rodgers, a/k/a "D.D.," "D;" Harold Smallwood, a/k/a "Skip," "Big Skip;" Edward P. Burton, a/k/a "Blue;" Jens Jamison, a/k/a "Chauncey;" David Williams, a/k/a "Dave Dog;" Defendants.**

No. 92–CR–159C.

United States District Court, W.D. New York.

Jan. 21, 1994.

Patrick H. NeMoyer, U.S. Atty. (William J. Hochul, Jr., Asst. U.S. Atty., of counsel), Buffalo, NY, for U.S.

Terry Granger and Alan S. Hoffman, Buffalo, NY, for defendant Donald Green.

Alan D. Goldstein and Daniel M. Griebel, Buffalo, NY, for defendant Darryl Johnson.

E. Carey Cantwell, Buffalo, NY, for defendant Derwin Rodgers.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria (Herbert L. Greenman, of counsel), Buffalo, NY, for defendant Harold Smallwood.

Walsh & Fleming (Robert G. Walsh, of counsel), Buffalo, NY, for defendant Edward Burton.

Murray & Coleman (Glenn E. Murray, of counsel), Buffalo, NY, for defendant Jens Jamison.

Anthony F. Leonardo, Rochester, NY, for defendant David Williams.

CURTIN, District Judge.

## BACKGROUND

On January 11, 1993, defendants Donald Green, *et al.*, moved to suppress all evidence of telephone conversations initiated by Green and others [1] while inmates of Shawangunk Correctional Facility, as well as any evidence gathered as a result of information gleaned from those conversations. Defendants claim that this evidence was obtained in violation of the Fourth Amendment of the United States Constitution,[2] as well as the New York State Constitution. They also claim that both Lieutenant Tasker—who made the tape-recordings and forwarded them to the Buffalo Police Department and the F.B.I.—and Superintendent Mann—who at least nominally

---

1. Only 6 of the 32 defendants named in the latest indictment remain in the case. The three other defendants who were inmates along with Donald Green at Shawangunk—Carlos Herrera, Angel Martinez, and Robert Felder—have all since pled guilty and do not challenge the use of any tapes.

2. The defendants also cite Ninth and Tenth Amendment violations in their original motion to suppress. These were not addressed in the Magistrate Judge's report nor did defendants refer to them again in their Joint Objections to the report. Therefore, I must assume they are no longer at issue.

oversaw Tasker's operation—violated 18 U.S.C. §§ 2510–2521 ("Title III") by respectively conducting and approving wiretapping surveillance without a court order.

The government responded that the tape-recording of inmate conversations without a warrant was proper under two statutory exceptions to the Title III requirement. First, the inmates were informed that their calls would be monitored, so their subsequent use of the telephone system implied consent under § 2511(2)(c). Second, Lieutenant Tasker made the tapes as part of the prison's ordinary course of business pursuant to § 2510(5)(a)(ii). The government further argues that because prisoners do not have a reasonable expectation of privacy, electronic monitoring and tape-recording of their telephone conversations do not constitute violations of either the United States or the New York State Constitution.

The Magistrate Judge held a hearing to determine the extent of the notice given to inmates at the facility regarding telephone monitoring and taping. The government offered into evidence an Inmate Orientation Handbook which explained the telephone system and stated that all conversations would be monitored. However, the manual did not indicate that the calls would be tape-recorded, nor was any warning given that use of the phones constituted consent to the monitoring.[3] The government also produced a signed acknowledgment of receipt of the handbook by Green and a log entry showing that Green attended an orientation session in which the phone system was reviewed. The size, appearance, position, and contents of the notices placed near the telephones which alerted callers to the prison's monitoring capabilities were documented. Finally, the government introduced a transcript of portions of several tapes (Govt. Ex. 1) which demonstrated that Green was aware of the monitoring and warned the parties on the line to be careful about what they said.

The defendants countered the government's assertion that notice was adequate to constitute implied consent with testimony

from other inmates. These witnesses admitted that they knew prison officials could listen to conversations but stated that they were told the calls would not be taped. The defendants also presented some evidence to indicate that the placement of the posted notices may not have met the New York State prison requirements, that Green's orientation session had occurred after the taping of his conversations began, and that the pertinent information on monitoring was never covered during orientation. Appendix, Tab 18 at 7. The defendants also objected to introduction of the excerpted transcript.

On September 16, 1993, the Magistrate Judge issued a Report and Recommendation that defendants' suppression motion be denied in its entirety. The Magistrate Judge found that the notices placed near the telephones, combined with the information given in the orientation manual and session, were sufficient to constitute implied consent to the monitoring and taping of phone conversations. Finding implied consent, the Magistrate Judge ruled that tape-recordings could properly be used as evidence absent a warrant because the procedure satisfied the consent exception to Title III, 18 U.S.C. § 2511(2)(c). The Magistrate Judge also ruled that Lieutenant Tasker taped Green's telephone calls as part of the facility's ordinary course of business. The defendants now appeal this recommendation to this court, which must make a *de novo* review of both the law and the facts at issue.

## DISCUSSION

### I. Federal v. State Law

The New York State Constitution, Art. 1, § 12 protects a right to privacy of telephone conversations. Defendants argue that this court is bound by the State's more stringent standard which does not permit use of evidence obtained through tape-recordings of phone conversations when there is only implied consent by one party. *See United States v. Sotomayor,* 592 F.2d 1219 (2d Cir. 1979).

---

**3.** The orientation handbook, under the title *Inmate Telephone Call–Home Program,* stated that:

This facility maintains the ability to monitor inmate phone conversations and a notice of this is posted at each telephone.

The government argues that *Sotomayor* only applies to state officials acting under a state court wiretap order issued pursuant to a state wiretap statute. *See U.S. v. Falsetti*, 721 F.Supp. 452, 456 (W.D.N.Y.1988). It claims that the facility staff's conduct comported with the pertinent New York regulations, which expressly authorize the policy of monitoring and taping inmates' telephone conversations. The New York wiretapping statute does not give prisoners greater protection than Title III.

The Magistrate Judge concluded that even if there were a conflict between state and federal law, the Title III provisions which specifically permit use of consensual recordings control over state eavesdropping regulations. *U.S. v. McNulty*, 729 F.2d 1243 (10th Cir.1984). Tab 16 at 11. I agree that federal law controls whether the tape-recorded interception of telephone conversations at a New York state prison can be used as evidence in federal court.

## II. Title III

■ 18 U.S.C. §§ 2510–2521 ("Title III") generally prohibits the intentional interception of telephone conversations in the absence of a court order. This prohibition extends to prison communications. *U.S. v. Amen*, 831 F.2d 373 (2d Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). The government relies on two exceptions to the Title III requirement to argue that the tapes may be admissible.

### A. Prior Consent Exception

■ Section 2511(2)(c) states that it is not unlawful "for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." The government argues that the tape-recordings were proper without a warrant because the inmates were on notice that their telephone calls were being monitored and that such notice constitutes implied consent.

Defendants attempt to distinguish acquiescence from consent and argue that neither the defendants who were inmates of Shawangunk or those receiving telephones calls ever consented to the tape-recording. They maintain that the inmates were never informed that the telephone conversations would be recorded and used against them in a criminal investigation. Tab 10 at 8–22.

Two Second Circuit Court of Appeals cases are controlling on this issue. In *U.S. v. Amen*, the court ruled that advance notice to prisoners that their telephone calls could be monitored and recorded and that use of the phone system constituted consent to such monitoring sufficed to meet the requirements of the consent exception under Title III. 831 F.2d at 378–79. *U.S. v. Willoughby*, 860 F.2d 15, 20–21 (2d Cir.1988), sanctioned the use of the tapes against nonprisoners receiving inmate calls as long as consent is found on the inmate's part.

The defendants in both *Willoughby* and *Amen* were fully informed of the monitoring and recording system. More importantly, they were notified that their phone conversations would be tape-recorded, could be used against them, and that such advance notification constituted consent. In both cases, the notices posted above the telephones explicitly stated that the Bureau of Prisons had the authority to monitor calls and that " 'use of institutional telephones constitutes consent to this monitoring....' " 860 F.2d at 20. In *Willoughby*, this notification of implied consent was repeated in the orientation session and in a form signed by inmates.

It is clear that inmates at Shawangunk received less notice of the prison's capacity to record the telephone conversations than did inmates in either *Willoughby* or *Amen*. Shawangunk inmates were informed that the prison system maintained the ability to monitor their phone calls with notices posted close to the telephones, and a brief mention in the orientation handbook and possibly at an orientation meeting. However, they were never told that use of the phone system constituted consent to be recorded, or that the prison could use the tapes as incriminating evidence in a criminal investigation against them.

The government argues that even without explicit notice that use of the telephones constituted consent, Green knew that the phones were monitored and that any discussion of criminal activity which was overheard could be used against him in some way. Over defendants' objection, the government offered into evidence a transcript of portions of several tapes in which Green either warned the parties he was calling of the monitoring or used a code to talk about alleged criminal activity. The government asserts that Green's subjective awareness that his conversations might be used against him effectively counters any argument of reasonable expectation of privacy the defendants might advance. The fact that he thought he was only being monitored and not recorded is of no import. "Mistaking the degree of intrusion of which probable eavesdroppers are capable is not at all the same thing as believing there are no eavesdroppers." *U.S. v. Harrelson*, 754 F.2d 1153, 1170 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985).

Defendants contend that the government cannot use the tapes to "bootstrap" its implied consent argument. "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *U.S. v. Jacobsen*, 466 U.S. 109, 115, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984). Moreover, they argue that mere subjective knowledge of intrusion does not equal consent. Tab 10 at 26.

■ In *Willoughby*, the court held "to be an oral communication that is protected by Title III, the speaker must have had a subjective expectation that the communication was not subject to interception, and this expectation must have been objectively reasonable." 860 F.2d at 22 (citing *Harrelson*, 754 F.2d at 1169–70). Both *Willoughby* and *U.S. v. Noriega*, 764 F.Supp. 1480, 1492 (S.D.Fla. 1991), referred to evidence of subjective knowledge taken from tape-recorded conversations to help determine whether a reasonable expectation of privacy existed under a Fourth Amendment claim. Therefore, the Magistrate Judge properly included evidence

of subjective awareness in the suppression hearing.

■ The Magistrate Judge's reliance on evidence which might not be admissible in a jury trial was also proper. The Federal Rules of Evidence 104(a) provides that in making a determination of "preliminary questions concerning … the admissibility of evidence, [the court] is not bound by the rules of evidence…." (1993). The Fifth Circuit Court of Appeals in *U.S. v. Ransom*, 515 F.2d 885 (5th Cir.), *cert. denied*, 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), held that a lower court committed no error in a suppression hearing by considering transcripts of intercepted phone conversations without requiring the government to establish an unbroken chain of custody for the taped conversations. Similarly here, the Magistrate Judge was entitled to consider the tape excerpts to help her determine whether the notice given to Green and his subjective awareness that his calls were being recorded sufficed to constitute implied consent as defined by *Amen* and *Willoughby*.

Based on my review of the transcripts and evidence submitted during the suppression hearing and the Second Circuit authority which defines the degree of notice necessary for implied consent under Title III, I am compelled to affirm the Magistrate Judge's recommended ruling that implied consent existed to record Green's telephone conversations for use in a criminal proceeding. I affirm reluctantly, because in so doing, the requirement that prison officials obtain a warrant to tape prisoner's phone calls for any reason appears to be further eviscerated. As the *Harrelson* court stated, "[o]ur holding should not, however, be construed as approving the government's failure to seek proper authorization for its electronic surveillance. Such conduct deserves no encouragement, but is rather to be deprecated; we do so." 754 F.2d at 1171.

*B. Ordinary Course of Duties Exception*

■ The Magistrate Judge also ruled that no warrant was required because the monitoring was conducted "by an investigative or law enforcement officer in the ordinary course of his duties," pursuant to 18 U.S.C.

§ 2510(5)(a)(ii). Although not necessary to this decision, I will discuss the application of this exception, because I disagree that Lieutenant Tasker's activities can be construed as operating in the ordinary course of business.

The Magistrate Judge found that the facility had a general policy of monitoring inmate calls, the prisoners were adequately notified of this policy, and Tasker had received Superintendent Mann's express permission to tape Green's conversations; thus, Tasker acted within his duties as a correctional officer. Tab 16 at 21. Defendants argue that this exception cannot be applied to the present case for two reasons. First, the recording of telephone conversations in a prison setting must be viewed as a type of administrative search. In *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), the Supreme Court warned that a warrantless search by prison officials must be closely regulated. The regulations must serve a substantial government interest, such as security, within the prison. The search cannot be merely a pretext for a criminal investigation. Defendants distinguish telephone monitoring from the more closely regulated visitation, cell search, and correspondence interceptions and argue that the lack of regulations detailing the scope of telephone monitoring and taping do not survive Constitutional requirements for permissible administrative search. Tab 10 at 28–29.

Defendants' second argument is that the taping of Green's phone calls was not done for ordinary business reasons. Prison officials are given wide scope in determining what measures are necessary for their legitimate task of maintaining prison security. However, in this case the recording of Green's conversations was not done to advance prison security but rather to gather evidence in a criminal investigation.

In *U.S. v. Vasta*, 649 F.Supp. 974, 989–90 (S.D.N.Y.1986), the monitoring and recording procedures of prisoners' phone calls were found not to be subject to the restrictions of Title III because the correctional officers doing the monitoring were law enforcement officers acting according to an institutionalized, publicized policy. On appeal, the *Amen* court affirmed that the Title III restrictions did not apply, but for the reason discussed above; the prisoners impliedly consented to the recording of their conversations based on the notice the prison gave of its monitoring activities. 831 F.2d at 379. The appellate court noted that it did not pass judgment on the applicability of the ordinary course of business exception "except so far as to express our reservation that the prison officials monitored the calls in the ordinary course of their duties." *Id.* at 378, n. 1.

The government cited several cases in which the routine monitoring of prison calls was found to be ordinary course of business. *See United States v. Sababu*, 891 F.2d 1308, 1328–29 (7th Cir.1989); *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980). In this case, however, the special attention paid to Donald Green's calls appear not at all routine or ordinary. According to the testimony of Lieutenant Tasker, inmate calls were ordinarily recorded on a reel-to-reel tape. Prison officials could listen in on the calls as they were being recorded or at the end of the day. In order to keep the tape-recording, it was necessary to either tape the conversation simultaneously onto a cassette tape or to copy the call from the reel-to-reel before it was taped over.

All of Green's phone calls were recorded on audio cassettes from the day he entered the prison, upon the suggestion of Tasker's fellow officer. A week later, Tasker requested and was granted permission to continue this practice, apparently indefinitely, in an informal meeting with Superintendent Mann. Despite the fact that Tasker allegedly overheard plans to conspire to commit murder, kidnapping, and large illegal drug sales, no prison official ever moved to cut off Green's telephone privileges or warn him that his conversations were being recorded and could be used against him. Instead, Tasker continued for more than one year to record Green's conversations and send them to the Buffalo Police and the F.B.I. for use in an ongoing criminal investigation.

These facts, including the focus on the calls of one particular prisoner, the extraordinarily

long time period in which the taping continued, and the large volume of tapes sent out to other investigative agencies, all contrast starkly with prior cases in which a few calls were taped in the course of routine monitoring. Even given the deference prison officials must be accorded in making determinations of what is necessary for security at their facilities, it is difficult to see how Lt. Tasker's actions comported with those needs. Indeed, the government does not attempt to argue that Tasker made audio cassettes of all Green's calls in the interest of maintaining security, but only that Tasker qualified as a law enforcement officer and that the prison facility routinely monitored calls.

That Tasker's activities were not part of the prison's ordinary business is underscored by the fact that in New York State prisons, the monitoring of telephone calls is not subject to the same regulatory controls as other security measures which curtail inmate rights such as reviewing correspondence and limiting visitation. The *Amen* court voiced concern that tape-recording phone conversations for use in criminal investigations could be construed as ordinary business in a federal prison, which is governed by elaborate regulations regarding the monitoring and notification procedures and uses. The concern becomes greater in a state prison system with much less regulated methods for determining who should be recorded and for what purpose, especially since Shawangunk inmates receive less notification of these activities than do federal prisoners. Therefore, I do not find that Lieutenant Tasker was pursuing the prison's ordinary course of business in taping Green's calls as part of a criminal investigation which was clearly separate from the functions of the facility.

### III. Fourth Amendment

■ Defendants argue that use of the tapes violates the Fourth Amendment rights of the noninmate defendants receiving the telephone calls. While the court may find that implied consent to tape-recording is enough for the inmates, it is inadequate for the party who has not consented. Defendants contend that permitting the use of implied consent in this context destroys the rationale that such "seizure" is authorized by the Fourth Amendment, provided one party is willing to cooperate with the government. *Rathbun v. U.S.*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *U.S. v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

Defendant Derwin Rodgers filed separate briefs (Items 230 and 325) asserting that the prison tapes should be suppressed on Fourth Amendment grounds for the same reason that the ordinary course of business exception to Title III was not met. Rodgers relies on *U.S. v. Cohen*, 796 F.2d 20 (2d Cir.1986), in which evidence obtained during a cell search requested by a United States Attorney was suppressed because it was not occasioned by the legitimate needs of institutional security.

I affirm the Magistrate Judge's ruling that the noninmate defendants' Fourth Amendment rights were not invaded by a warrantless interception of telephone calls made by inmates. Tab 16 at 23–24. "Contacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates's privacy.... Given the institution's strong interest in preserving security, we conclude that the interception of calls from inmate to noninmates does not violate the privacy rights of the noninmates." *Willoughby*, 860 F.2d at 21–22. Further, as the Magistrate Judge stated, the *Amen* court held that "prison inmates have no reasonable expectation of privacy.... [I]t is reasonable to monitor prisoners' telephone conversations, particularly where they are told that the conversations are being monitored." 831 F.2d at 379–80. This holding effectively quashes any Fourth Amendment challenge by inmates to monitoring of their telephone communications.

### CONCLUSION

For the reasons enumerated, I affirm Magistrate Judge Heckman's Report and Recommendation of September 16, 1993, denying defendants' joint motion to suppress evidence of the prison tapes based on Donald Green's implied consent to the monitoring and taping of his telephone calls.

So ordered.