William LANGTON and David LeBlanc,
Plaintiffs–Appellees,

v.

William HOGAN, Jr., et al.,
Defendants–Appellants.

No. 95–1582.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1995.

Decided Nov. 21, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied
Dec. 14, 1995.

Robert J. Munnelly, Jr., Assistant Attorney General, with whom Scott Harshbarger, Attorney General of Massachusetts, Karen Laufer, Assistant Attorney General, and Philip W. Silva IV, were on brief for appellants.

Dennis J. Bannon, Boston, MA, for appellees.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and KEETON,* District Judge.

KEETON, District Judge.

This is an appeal by Defendants–Appellants from a 1995 Judgment of the district court modifying, on motion of Defendants–Appellants, but not to the full extent they requested, a Permanent Injunction ordered in 1984. We treat the 1995 Judgment as in essence a ruling on a motion for modification of a consent decree that did no more than decide the issues before the court, as the matter was presented by Defendants–Appellants. Discerning no error of law, no clearly erroneous finding of fact, and no abuse of discretion, we affirm.

## I. Background Facts and Procedural History

In 1979, the Plaintiffs–Appellees, two inmates of a Massachusetts correctional institution, filed a civil action under 42 U.S.C. § 1983, claiming, among other things, that predecessors of Defendants–Appellants in positions of authority in the institution and the state correctional system had violated and were continuing to violate constitutionally protected rights of the inmates by intercepting and monitoring their telephone calls, including calls to their counsel as well as other private calls, and that such interception and monitoring violated the federal and state wiretapping statutes, 18 U.S.C. §§ 2510 *et seq.* and Mass.Gen.L. ch. 272, §§ 99 *et seq.*

For convenience, we will refer to Plaintiffs–Appellees as plaintiffs or by name, and Defendants–Appellants as defendants or the Department of Correction.

In 1984, after negotiations of the parties, and consultations of counsel and the judge to whom the case had been randomly assigned, the parties entered into a Settlement Stipulation, dated October 17, 1984, providing for a Permanent Injunction in the form of an attached exhibit, and a Judgment of Dismissal in the form of another attached exhibit. The district court (Zobel, D.J.) approved the settlement and made the two orders. One was the Judgment of Dismissal, reciting that, in view of the Settlement Stipulation,

> all of the claims by both plaintiffs in this action are dismissed with prejudice and without costs or attorney's fees to any party.

App. 000029.

The other was a Permanent Injunction in view of the Settlement Stipulation:

> 1. All officers, agents, servants, employees and attorneys of the Department of Correction are enjoined permanently, under both 18 U.S.C. §§ 2510 *et seq.* and M.G.L. c. 272, §§ 99 *et seq.*, from intercepting, endeavoring to intercept or procuring any other person to intercept, any wire communication by or to William Langton or David LeBlanc, inmates within the custody of the Department, without a specific court order or legislative authorization to do so, except as specifically permitted by these statutes, taken together, as they have been amended or may be amended and as they have been construed in reported decisions that are binding in this Court or in the state courts of Massachusetts.
>
> 2. This Permanent Injunction, entered pursuant to the Settlement Stipulation dated October 15, 1984, shall operate prospectively only. It shall not of its own force

---

* Of the District of Massachusetts, sitting by designation.

affect the rights of inmates of the Department other than William Langton and David LeBlanc.

App. 000030–31.

The Department of Correction apparently complied with the Permanent Injunction without incident for almost a decade, until April 1994, when it promulgated new regulations governing telephone access and use by inmates, 103 C.M.R. §§ 482.00 *et seq.* (hereinafter "the Regulations"). These Regulations, ostensibly applicable to all inmates in all Department institutions and facilities, instituted a system of routine monitoring of inmate telephone calls by the Department of Correction and required inmates to sign a form consenting to having their calls monitored, or be deprived of their telephone access. The Regulations also limited the number of telephone calls that could be made by inmates to ten monitored calls to non-lawyers, and five non-monitored calls to lawyers. All telephone calls, whether lawyer or non-lawyer, were required to be pre-approved.

The Department of Correction sought to apply the new Regulations to plaintiffs. Plaintiffs refused to sign the consent forms and were denied telephone access. In June 1994, plaintiffs filed a Petition for Contempt alleging that the Department of Correction had prohibited plaintiffs from placing telephone calls unless they agreed to permit the recording of all their telephone calls. Defendants moved to dismiss the petition for contempt, and plaintiffs filed an opposition to the motion to dismiss.

While the motion to dismiss was still pending, defendants filed, in January 1995, a Motion to Modify the Permanent Injunction

to allow for the restrictions, monitoring and recording of plaintiffs' telephone use in accordance with the Department of Correction's new telephone regulations, 103 CMR 482.00 *et seq.*

App. 000077.

On February 21, 1995, Judge Zobel signed a Memorandum of Decision, the last paragraph of which is as follows:

Defendants' motion to modify the permanent injunction is allowed to the extent that the Department of Correction may limit plaintiffs' access in accordance with the Regulations, 403 CMR §§ 482.00 *et seq.* It is denied to the extent that defendants shall not monitor plaintiffs' calls and § 482.10 shall not apply to plaintiffs. Counsel shall submit a form of judgment reflecting the modification allowed.

App. 000103.

Counsel having failed to agree upon a form of judgment reflecting the modification allowed, Judge Zobel, on May 3, 1995, signed a Judgment as follows:

After hearing on the defendants' Motion to Modify the Permanent injunction, and in accordance with the Court's Memorandum of Decision dated February 21, 1995, it is hereby ordered and adjudged:

1. The defendants shall not monitor or record the telephone calls of the plaintiffs, William Langton and David LeBlanc.

2. The provisions of 403 CMR § 482.10, shall not apply to the plaintiffs (except for call detailing, which shall apply to the plaintiffs) pending further order of the court upon application of the defendants.

3. Acceptance by each plaintiff of a PIN and use of inmate telephones shall not be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring or recording.

4. The defendants shall notify by letter each non-attorney whose name appears on the plaintiffs' lists of preauthorized telephone numbers that the message regarding recording and monitoring should be disregarded and that calls made by the plaintiffs are not subject to monitoring and recording.

5. The plaintiffs may request changes in their preauthorized telephone numbers at any time. Such changes shall be made expeditiously by the defendants provided they are in compliance with the restrictions on the total number of personal and attorney numbers plaintiffs are allowed to call pursuant to 403 CMR 482 *et seq.* If, at any time, defendants believe plaintiffs are abusing this arrangement, they may petition the court for further relief.

6. Defendants' Motion to Modify the Permanent Injunction is allowed to the extent that the Department of Correction may limit plaintiffs' access in accordance with the Regulations, 403 CMR § 482.00 *et seq.*, as amended, so long as such amendments do not change the substance of this order.

7. Modification of the Permanent Injunction entered by this court on October 15, 1984 is required for the Department of Correction to apply new inmate telephone access regulations to the plaintiffs.

App. 000104–106.

## II. The 1984 Permanent Injunction and Judgment of Dismissal

The 1984 Permanent Injunction was not in the classic mold of consent decrees, as two orders were made rather than a single integrated consent decree. The terms of these two orders, however, were as surely part of the terms of the settlement as were the recitations in the document entitled Settlement Stipulation. In this case, we take account of the terms of all three documents in construing each, and we conclude that they do not support the interpretation urged upon the district court, and here, as the primary contention of defendants.

This is an appeal from the district court's ruling on a motion for modification, yet defendants have not presented arguments as to why the 1995 Judgment should be modified, in light of changes in law or fact, to allow the Regulations to be applied to the plaintiffs. Defendants instead contend that the Regulations should be applied to the plaintiffs because the Regulations do not violate, and never have violated, the 1984 Permanent Injunction. Defendants argue that the federal and state wiretapping statutes, as they interpret those statutes, do not prohibit the Regulations, and therefore the Permanent Injunction does not prohibit the Regulations.

Rather than argue for modification, defendants, in essence, argue that the Permanent Injunction did no more than prohibit them from violating law, that there was never any adjudication that they had violated any constitutionally protected right of plaintiffs, that they yielded nothing with regard to any rea-

sonably disputable issue of law or mixed-legal-factual issue but merely stipulated that they would not commit certain types of violations of law in the future, and therefore that when the district court in 1995 purportedly granted in part but not fully their motion for modification of the Permanent Injunction, the court was in effect enlarging the injunction in plaintiffs' favor rather than granting limited modifications in defendants' favor in order appropriately to tailor relief to defendants' showing, on the record before the district court at the time it made its 1995 ruling, of changes in law or fact that warranted modification of the Permanent Injunction.

We conclude that the position of Defendants–Appellants is flawed in several ways, as explained below.

If the Permanent Injunction did not in any way enlarge the rights of plaintiffs beyond what they were under defendants' proposed interpretation of the law, then defendants gave up nothing in settling the dispute. This is an unlikely interpretation and we do not accept it. If it were correct, no purpose would be served by the declaration in paragraph 2 that the Permanent Injunction "shall not of its own force affect the rights of inmates of the Department other than William Langton and David LeBlanc." Defendants' contention, in effect, asks us to hold that both paragraph 1 and paragraph 2 were illusory—stating nothing beyond what was already forbidden by law before the Permanent Injunction was entered. This is not a reasonable interpretation.

The usually understood meaning of a Settlement Stipulation is that each party is agreeing to give up something—to yield on one or more reasonably plausible contentions of law, or fact, or mixed-law-fact issues. "[T]he agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, at 681, 91 S.Ct. 1752, at 1757, 29 L.Ed.2d 256 (1971). When making an agreement for a consent decree, the parties to a case are agreeing not to press any of their disputes to

decision in court. The parties forego "their right to litigate issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." *Armour,* 402 U.S. at 681, 91 S.Ct. at 1757. We so interpret the Settlement Stipulation of the parties to this case. The parties' disputes thus settled may include disputes about applicable law, disputes about facts, and disputes about mixed-legal-factual issues, including disputes about the materiality under rules of law (as finally determined in court proceedings at trial or on appeal) of particular disputes of fact.

In the present case, it was clear, before the Settlement Stipulation, that disputes of fact had been raised by the pleadings. It might reasonably be argued in support of the position now advanced by defendants, however, that rather than settling the merits of these disputes the Settlement Stipulation rendered them moot. Without so deciding, we assume in defendants' favor that this is so as to any strictly factual disputes.

■ As to the reasonably disputable issues of law or mixed-legal-factual disputes, a settlement and consent decree in accordance with the settlement preclude the parties from reasserting their contrasting legal arguments on such issues without having first shown cause for vacating or modifying the consent decree. Whatever the law governing this case might have been just before the parties entered into the Settlement Stipulation, the Permanent Injunction was a lawfully entered order of court. The law as between the parties to the case is what it was agreed to be in the Permanent Injunction. The Supreme Court has stated:

> [T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.... [T]he instrument must be construed as it is written, and not as it might have been written had the plaintiff [or defendants] established his [or their] factual claims and legal theories in litigation.

*Armour,* 402 U.S., at 681–82, 91 S.Ct. at 1757. *Accord, Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984). The parties are not free to argue their contrasting legal theories of the meaning of the statutes that underlie the Injunction, because they gave up the right to have *that* dispute resolved by the court.

■ We take account of the fact that *Armour* was decided long before *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), and that *Armour*'s holdings must be read today, especially as applied to an institutional consent decree like that before us now, with sensitivity to any modification of precedent that the decision in *Rufo* has effected. As we note in Part IV below, however, this point bears principally upon whether modification of the Permanent Injunction should be made, not upon what the Permanent Injunction meant when entered, or meant in 1994 or 1995, absent modification.

We take account also of unsettled questions regarding whether *Armour* was modified by *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). We conclude, however, that even if *ITT* is read as liberalizing to some degree the standard for going outside the text of a consent decree to assist in determining its meaning, defendants have not offered any persuasive reason for going outside the text of the Permanent Injunction in this case. Even if we were to assume that ambiguity of the meaning of the text of the Permanent Injunction warrants our consideration of extraneous sources of clarification, defendants' position is not aided. Looking outside the text of the Permanent Injunction to then existing law, rather than clarifying defendants' position, muddles it further, because the existing law was uncertain and yet to be determined (as explained in Part III below). We see no reason to permit defendants to argue that genuine disputes regarding what the state and federal statutes prohibited defendants from doing, or permitted them to do, should be resolved now in defendants' favor and thereby control the meaning of the Permanent Injunction. Instead we hold that the Permanent Injunction (along with the associated documents) settled those underlying legal disputes.

The way in which a consent judgment or consent decree resolves, between the parties, a dispute over a legal issue is not a ruling *on the merits* of the legal issue that either (1) becomes precedent applicable to any other proceedings under the law of *stare decisis* or (2) applies to others under the law of claim preclusion or issue preclusion. *See Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (parties to litigation cannot enter into a consent judgment that will preclude a person not made a party from bringing a later suit alleging violation of his or her legal rights). The resolution of the legal dispute by consent judgment is nonetheless binding on the parties to the case in which the consent judgment is entered. The parties to this case are bound by the rules of law declared in the Permanent Injunction, although no other parties are so bound.

We state the point more generally. When a dispute of law exists between parties to a case and they agree to a settlement of that dispute and entry of a judgment with prejudice based on that settlement, then the terms of that judgment in relation to that legal issue are subject to res judicata principles. A judgment that is entered with prejudice under the terms of a settlement, whether by stipulated dismissal, a consent judgment, or a confession of judgment, is not subject to collateral attack by a party or a person in privity, and it bars a second suit on the same claim or cause of action. *See 1B Moore's Federal Practice* ¶ .409[5] (2d ed. 1995). Such a judgment has the force of res judicata until further order of that or a higher court modifying that consent judgment. This proposition is supported in a large body of precedent. *See, e.g., In re Medomak Canning*, 922 F.2d 895 (1st Cir.1990) (generally a court-approved settlement receives the same res judicata effect as a litigated judgment); *accord, In Re Laing*, 31 F.3d 1050 (10th Cir.1994); *Keith v. Aldridge*, 900 F.2d 736 (4th Cir.1990), *cert. denied*, 498 U.S. 900, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990); *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574 (Fed.Cir.1989), *cert. denied*, 493 U.S. 855, 110 S.Ct. 160, 107 L.Ed.2d 117 (1989); *Kurzweg v. Marple*, 841 F.2d 635 (5th Cir. 1988); *Amalgamated Sugar Co. v. NL Industries*, 825 F.2d 634 (2d Cir.1987), *cert. denied*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987).

## III. Settling Disputable Issues of Law

Defendants have not called attention to any "specific court order or legislative authorization" occurring after the entry of the Permanent Injunction. Defendants' position is not salvaged by the language in the Permanent Injunction stating that defendants are enjoined under the state and federal acts from intercepting telephone calls,

> except as specifically permitted by these statutes, taken together, as they have been amended or may be amended and as they have been construed in reported decisions that are binding in this Court or in the state courts of Massachusetts.

The statutes do not "specifically permit" the Regulations, and the meaning of the statutory provisions for permitted interception and monitoring, as "amended" or "construed" in "binding" decisions, is at least reasonably susceptible to a construction contrary to defendants' proposed interpretation.

Defendants contend that the Regulations do not violate the state or federal wiretapping statutes for three reasons. Even now, reasonable arguments can be advanced against, as well as for, each of defendants' contentions about the applicable law.

First, defendants argue that the Massachusetts Wiretap Act, Mass.Gen.L. ch. 272, §§ 99 *et seq.*, prohibits only secret "interception", and monitoring under the Regulations is not secret and therefore not prohibited. The 1984 Permanent Injunction, however, prohibited conduct that would amount to "interception" under federal law, even if that conduct would not amount to "interception" under state law. The federal wiretap act, 18 U.S.C. §§ 2510, *et seq.*, does not make secrecy decisive. That act, as of 1984, defined the term "intercept" as simply "the aural acquisition of the contents of any wire, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Monitoring and recording of plaintiffs' telephone calls under the Regulations thus constitutes "interception" under

the 1984 Permanent Injunction, despite its being performed openly and without secrecy.

Second, defendants attempt to argue that the new Regulations do not violate the 1984 Permanent Injunction because the definition of "interception" within the federal wiretapping act, at 18 U.S.C. § 2510(5), expressly excludes recording or monitoring performed "by an investigative or law enforcement officer in the ordinary course of his duties." Defendants interpret the statute to mean that monitoring by corrections officials under the Regulations falls within the excluded category. The defendants have not shown beyond genuine dispute, however, that in monitoring conversations corrections officials would be acting as *investigative* or law *enforcement* officer[s] in the *ordinary* course of [their] duties." Defendants cite several cases from other courts that may be read as so holding. *United States v. Sababu,* 891 F.2d 1308, 1328 (7th Cir.1989); *United States v. Paul,* 614 F.2d 115, 117 (6th Cir.1980); *State v. Fornino,* 223 N.J.Super. 531, 539 A.2d 301, 308 (App.Div.1988). We are, however, aware of no reported decisions to this effect that are binding in this court or in the state courts of Massachusetts. In *Campiti v. Walonis,* 611 F.2d 387, 392 (1st Cir.1979), the First Circuit expressly reserved decision as to whether monitoring in accordance with an established prison policy of which the prisoners were informed could qualify as part of the ordinary course of business of a law enforcement officer. The issue in this circuit was in 1984, and still is, reasonably debatable.

Finally, defendants argue the new Regulations do not violate the 1984 Permanent Injunction because the federal act under 18 U.S.C. § 2511(2)(c) permits monitoring or recording by "a person acting under color of law" where "one of the parties to the communication has given prior consent to such interception." Defendants contend that the Regulations meet the one-party consent exception of the federal act because inmates impliedly consent to be monitored when they use the telephone after being made aware that monitoring of calls is a condition for being allowed to use the telephone. Defendants have cited cases from other jurisdic-

tions holding that execution of forms by inmates that acknowledge their understanding that their calls will be monitored constitutes consent under the federal act, even if inmates are denied telephone access if they do not sign the forms; and that calls placed by inmates despite express notice from stickers on the telephones and the message from the automated operator that accompanies every call constitutes consent. *See United States v. Horr,* 963 F.2d 1124, 1126 (8th Cir.1992); *United States v. Amen,* 831 F.2d 373, 378–79 (2d Cir.1987); *United States v. Willoughby,* 860 F.2d 15, 20–21 (2d Cir.1988); *United States v. Paul,* 614 F.2d 115, 117 (6th Cir. 1980); *United States v. Valencia,* 711 F.Supp. 608, 611 (S.D.Fla.1989); *United States v. Green,* 842 F.Supp. 68, 71–71 (W.D.N.Y.1994). Defendants also argue that because the Regulations require positive call acceptance from the recipient after hearing a recorded message, recipients are deemed to have impliedly consented. Defendants, however, cite no cases to this effect.

Once again, we are aware of no reported decisions that are binding in this court or in the state courts of Massachusetts, holding that this type of prison telephone monitoring system meets the one-party consent exception to the federal wiretapping act due to implied consent. It may reasonably be argued that "implied consent" in this sense is not a free and voluntary consent; it is instead no more than a choice between unattractive options—a limited choice imposed on plaintiffs by defendants. The issue then becomes whether the law allows the defendants to impose this limitation of choice on the defendants and call their response an implied consent. At the least, grounds exist for genuine dispute about whether defendants are authorized by law to impose such a limited choice on plaintiffs and whether "implied consent" under these circumstances is "consent" as that term is used in the federal act, and legally effective consent under the Department's regulations. *See Griggs–Ryan v. Smith,* 904 F.2d 112 (1st Cir.1990) (holding that "implied consent" is consent in fact, inferred from associated circumstances indicating that a party knowingly agreed to surveillance).

The issue of what constitutes "implied consent" in the prison context has not yet been directly addressed by this court, and we do not decide it here. It is sufficient to point out that plaintiffs in this case have not consented, impliedly or otherwise, to the monitoring scheme; plaintiffs instead brought a contempt action under the Permanent Injunction, an opposition to defendants' motion to dismiss the contempt action, and an opposition to defendants' motion for modification of the Permanent Injunction. We do not read *Griggs–Ryan* as supporting the view that an inmate has impliedly consented to the very scheme the inmate has challenged as a violation of the 1984 Permanent Injunction.

Defendants entered into a Settlement Stipulation under which each party gave up the right to have the dispute as to the meaning of the federal and state wiretapping statutes resolved by a court. The meaning of what was permitted under the state and federal wiretapping statutes was ambiguous and reasonably debatable. Defendants have no right to have that dispute now decided in their favor and then to use that resolution to interpret the terms of the Permanent Injunction.

Of course, this does not mean defendants are forever barred from moving that the court orders be vacated or modified. Special rules are applicable to institutional consent decrees, but they concern grounds for vacating or modifying a consent decree, rather than undermining the force of this body of precedent in relation to the effect of the consent decree until vacated or modified. We perceive no error in Judge Zobel's invoking for guidance, in her consideration of the defendants' motion for modification of the 1984 Permanent Injunction in this case, the body of precedent applicable to motions for modification of a consent decree. This body of precedent includes the case on which she relied especially, *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (holding that a party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law). Under the guidance of *Rufo,* however, a court considering such a motion would be concerned with tailoring modifications according to intervening changes in law (as well as fact). It would not be deciding the original dispute about what would have been a court's answer to the dispute had the parties not entered into their Settlement Stipulation.

## IV. The Nature of the 1995 Judgment

■ When these legal principles are applied here, can it reasonably be said that the 1995 Judgment modified the consent decree *in plaintiffs' favor,* as defendants contend, rather than only in defendants' favor though less substantially so than they requested? We conclude that, as properly construed in the way explained below, the 1995 Judgment modified the Permanent Injunction only in defendants' favor. It was appropriately tailored to the only changes in law or in fact disclosed on the record before the district court as developed after ample opportunity for defendants to present both legal and evidentiary support for their motion for modification.

The only changed circumstances shown on the record before the district court at the time of its 1995 Judgment were changes of fact with respect to technology of initiating, detailing, effecting, monitoring, and recording electronic transmissions, including telephone calls. The only changes of law shown were those effected when the Department of Correction adopted new regulations, published in 403 CMR §§ 482.10 *et seq.* Rather than attempting to show that the district court's modifications, recited in the 1995 Judgment, were not reasonably tailored to those changes, defendants seek to show that the 1984 Permanent Injunction was not in any respect a settlement of a disputed issue of law but instead preserved their unlimited right to assert their view of the law and have that dispute decided now in their favor.

Defendants ask us on this appeal to resolve that original dispute about the law in their favor, and argue that the district court should have done so instead of conceiving its duty as one of considering whether intervening changes of law (as well as fact) had occurred, and, if so, how to tailor modifica-

tions of the consent decree accordingly. We reject this contention.

The key modification of the 1984 Permanent Injunction that the 1995 judgment makes is explained:

> Modification of the Permanent Injunction entered by this court on October 15, 1984 is required for the Department of Correction to apply new inmate telephone access regulations to the plaintiffs.

The 1995 judgment adds, for clarity, a statement of some of the terms that remain in effect. These terms are not enlargements of the terms of the Permanent Injunction in plaintiffs' favor; they simply clarify limits on the scope of the modifications in defendants' favor.

The 1995 judgment says nothing, either directly or impliedly, about how any future motion for modification with appropriate showing of cause and request for appropriately tailored relief should be heard and decided under the principles of *Rufo,* 502 U.S. 367. Nor do we. Instead, we leave such matters for decision in the future only if and when they are appropriately presented first in district court.

## V. Conclusion

For the foregoing reasons Defendants–Appellants' arguments fail. The 1995 judgment of the district court is *AFFIRMED.*

BOUDIN, Circuit Judge, dissenting.

This case turns centrally on the interpretation of a provision of a 1984 consent decree settling a case that Langton and LeBlanc brought against Massachusetts corrections officials. The majority's opinion contains many unexceptionable statements of law, but on the pivotal issue—the reading of a sentence of the 1984 decree—the majority's reading simply does not square with either the decree's language or its purpose. Indeed, because this case involves the regulation of a state agency by federal judges under an elderly consent decree, it raises issues of policy and judicial attitude that go beyond a mere quarrel about decree language.

1. In 1979, Langton and LeBlanc filed a 1983 action against the state prison authorities complaining of mistreatment. The complaint alleged that using corrections officers to distribute medication violated state health laws and the Constitution; that the number of telephone calls permitted to the plaintiffs was too few and the time limit too short; and finally that the prison had been monitoring telephone calls—one call by Langton to an attorney was specified—and that such monitoring violated 18 U.S.C. § 2510 and Mass. Gen.Laws ch. 272, § 99, the federal and state wiretapping statutes.

In an April 1983 decision, the district court considered the medication and limited-calls issues at some length, and it concluded that no protected rights had been violated and ordered summary judgment for the defendants. In a brief discussion of the monitoring issue, the district court said that "[n]onconsensual monitoring of inmate calls may violate 18 U.S.C. § 2510," citing a then-recent decision of this court. Although the defendants denied any such monitoring, Langton's affidavit described one incident in which he thought that a telephone call to his lawyer had been monitored; the court said that the affidavits, "if just barely," created a factual issue precluding summary judgment.

In October 1984 the parties entered a settlement agreement that dealt with several different grievances. The proposed remedies included new regulations permitting inmates' access to telephones for at least 15 minutes per day, furnishing Langton a three-drawer metal file cabinet and a stereo system in his cell, and arrangements concerning Langton's use of an electric typewriter in the prison library. Finally, the parties agreed to the entry of a permanent injunction whose main paragraph read as follows:

> All officers, agents, servants, employees and attorneys of the Department of Correction are enjoined permanently, under both 18 U.S.C. §§ 2510 *et seq.* and M.G.L. c. 272, §§ 99 *et seq.,* from intercepting, endeavoring to intercept, or procuring any other person to intercept, any wire communication by or to William Langton or David LeBlanc, inmates within the custody of the Department, without a specific court

order or legislative authorization to do so, except as specifically permitted by these statutes, taken together, as they have been amended or may be amended and as they have been construed or may be construed in reported decisions that are binding in this Court or in the state courts of Massachusetts.

There has been no showing that this provision aimed to resolve any dispute between the parties as to what was or was not unlawful. Indeed, the settlement agreement said, in the paragraph proposing the injunction just quoted, that corrections officers "specifically deny that any of them, or anyone acting in concert with any of them, ever intercepted or monitored any of Langton's or David LeBlanc's wire communications by any means, lawful or unlawful...." In short, the parties disagreed about whether monitoring had occurred, and the matter was settled by a forward-looking decree that enjoined obedience to two cited statutes.

In recent years, prisons have encountered a growing number of problems created by inmate telephone calls.[1] These problems include the use of telephones to obtain narcotics in prisons, to promote illegal drug trading outside of prison as well as other criminal operations, commit fraud in the purchase of merchandise and goods for prisoners, and to carry out obstructions of justice and escape plots. Ultimately Massachusetts followed a number of other prison systems including the federal prison system in adopting a standardized regime to control and track inmate use of the telephone system.

The new Massachusetts regime allows each inmate to list up to ten family members and friends and up to five private attorneys or law firms, in addition to three automatically authorized legal service organizations. Each inmate can place a call only by using his or her personal identification number, and the technology restricts the call to one of the 18 telephone numbers authorized for that inmate. To obtain such a PIN number, the inmate completes a form that requires the inmate's consent to various conditions, including call monitoring, call recording and the retention of various "details" incident to the call (e.g., the time of the call, the number called). But calls to attorneys, law firms and the legal service organizations are *not* subject to monitoring or recording.

Langton and LeBlanc refused to complete the consent forms, were denied telephone access, and in June 1994 began the contempt proceeding that prompted the present appeal. When the defendants moved to dismiss the petition on the ground that they had not violated the consent decree, the district judge indicated that a motion to modify the decree should be filed. Without agreeing that it was necessary, the defendants filed the suggested motion. Their affidavits provide reasons why they think it impractical or dangerous to except Langton and LeBlanc from the regime that is now applied to all other prisoners.

In February 1995, the district judge entered an unpublished decision which treated the issue before the court as a motion for modification of the consent decree. Fed. R.Civ.P. 60(b)(5), (6). The court granted the government's motion in part and denied it in part, ruling that the new regime did respond to new technology and real threats of abuse, that Langton and LeBlanc could be limited as to the number of telephone calls they could make, but that there was no pattern of abuse by either of them to justify the monitoring of their calls. The core of the court's injunctive judgment is that prison officials cannot monitor or record calls made by these two plaintiffs.

2. The broad question on appeal is whether the monitoring and recordation regime violates the consent decree. The district court evidently assumed that it did—thus its suggestion that the government file a motion for modification—but it never addressed this issue in detail. Yet if the regime does not violate the consent decree, the contempt proceeding case should have been dismissed and the Rule 60(b) motion mooted. Langton and LeBlanc have never moved to modify the decree to enlarge their rights; and prison officials, in moving to modify the decree in

---

1. This intervening history is recounted in defense affidavits filed in the district court incident to the

latest round of litigation and the description was largely accepted by the district court.

their favor (in accordance with the district court's suggestion), certainly were not abandoning their bedrock position that the new regime was lawful under the decree and did not require any decree modification.

In my view, a realistic reading of the 1984 decree provision is that it effectively enjoined state prison officials from violating the cited provisions of federal or state law *and nothing more.* True the provision was clumsily worded: it juxtaposed a ban on interception, itself a term differently defined under the two cited statutes, with an awkward but broadly worded qualification, namely, that interceptions are allowed "as specifically permitted by the statutes, taken together, as they may have been amended or may be amended and as they have been construed or may be construed in reported decisions that are binding in this Court or the state courts of Massachusetts."

The injunction could and probably should have used a much simpler formulation, such as a ban on "unlawful" interceptions, but everyone knows that lawyers often overwrite legal documents. There is no indication anywhere that the phrase "specifically permitted" means anything more than "permitted," the term "specifically" being the kind of legal flourish that usually causes more trouble than it solves. In any event, the provision itself describes the defendants as "enjoined . . . under both 18 U.S.C. §§ 2510 *et seq.* and M.G.L. c. 272, §§ 99 *et seq.*" and nothing in the provision suggests that the injunction was intended to be broader than the statutes themselves.

This view is confirmed by the "circumstances surrounding the formation of the consent order" which are properly considered in its interpretation. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). The *casus belli,* it must be remembered, was a claim, denied by prison officials, that they had monitored an inmate's call to his lawyer, something that no one would expect a court or legislature to authorize. The prison offi-

cials, who never contended that such a monitoring of calls to lawyers would be lawful, simply denied that they did any monitoring. The parties then settled the case by having the defendants enjoined to obey federal and state law on interception, as it might be construed by courts or amended by legislatures from time to time.

The panel majority expresses disbelief that plaintiffs in a lawsuit would ever settle merely for a promise by defendants to obey the law. But in fact such provisions are common in decrees (SEC consent decrees are a classic example) and, in any event, a promise simply to obey the law made perfectly good sense in this case. The settlement provided Langton and LeBlanc a small number of specific benefits already described. As to telephone monitoring, the prison did not defend listening in on a telephone call between an inmate and his lawyer, but denied that monitoring had occurred or was routinely practiced. Langton and LeBlanc then settled for a general provision that made the prison officials subject to contempt proceedings if they did violate the law in the future.

If the decree is read in this fashion, then the contempt motion boils down to the question whether the prison's new regime is lawful under the relevant statutes. Nothing in the decree's terms prohibits monitoring or recording as such. The decree uses the term "interception" which is a statutory concept freighted with exceptions, and the decree's ban is itself subject to the broad "except as" clause already described. Nor does the panel majority *hold* that the present regime is unlawful under the federal and state statutes but only that reasonable arguments can be made on both sides.

The issue of the regime's lawfulness under the statutes may be debatable, but it is doubtful that it is a close call. Massachusetts has adopted a widely used model, used by the federal prison system as well, *see generally* 28 C.F.R. § 540.100 *et seq.,* and practically all the case law cited in the briefs tends to support it.[2] Given the general

---

2. *E.g., United States v. Horr,* 963 F.2d 1124, 1126 (8th Cir.1992); *United States v. Sababu,* 891 F.2d 1308, 1326–30 (7th Cir.1989); *United States v. Willoughby,* 860 F.2d 15, 19–21 (2d Cir.1988);

*Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir. 1988); *United States v. Amen,* 831 F.2d 373, 378–80 (2d Cir.1987); *United States v. Paul,* 614 F.2d 115, 117 (6th Cir.1980); *United States v. Green,*

wording of the federal and state statutes, and the strong policy considerations for giving prison officials "appropriate deference and flexibility," *Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995), it is very unlikely that a regime like that of Massachusetts would be struck down, even if there are possible occasional applications that might raise hard questions.

In any event, once it is understood that the decree only precludes *unlawful* interception, the district court has provided no basis for entering a judgment against the prison officials since that court did not find that the regime violated federal or state law. It is true that this general question is one of law that we might in theory resolve ourselves; but no such theory has been adequately briefed by the plaintiffs, and no decision of a district court on this issue has ever been rendered. The proper solution in this case is to vacate the district court's 1995 judgment and remand to give the plaintiffs the opportunity to show that the present regime is unlawful, and *therefore* in violation of the decree.

The panel majority's contrary construction of the decree does not rest on an attempt to grapple seriously with its language and background. Rather, the majority relies primarily on several rather general propositions: that parties sometimes do resolve by consent decree legal issues that are reasonably debatable, that such resolutions have an operative effect through the consent decree, and that parties are bound by the decree even if the legal issues should have been decided the other way. These notions might have some bearing if the prison officials had agreed, with no exceptions, that "monitoring and recordation" are prohibited. But the defendants did not make such a bargain, so the general propositions relied on by the majority have nothing to do with this case.

To sum up, the panel majority could decide on the merits whether the new Massachusetts regime does violate the federal or state statutes, and it would be equally permissible, and in my view more appropriate, to vacate the 1995 judgment, to remand and to allow the district court to consider this set of issues in the first instance. But what is not tenable is an interpretation of the 1984 consent decree, without serious support in either its phrasing or its context, that enjoins Massachusetts officials from doing what (so far as we know from the precedents) they lawfully can do under existing federal and state law.

Courts have been widely criticized in recent years for excessively interfering with state institutions such as prisons and, of course, these charges are often made by those who are unaware of the abusive conditions that the federal decrees are invoked to remedy. But it does behoove federal judges—who do not have political responsibility for managing these institutions—to consider with care and modesty how they interpret their authority, especially in construing elderly decrees as applied to entirely new sets of conditions.

842 F.Supp. 68, 71–72 (W.D.N.Y.1994); *United States v. Valencia,* 711 F.Supp. 608, 611 (S.D.Fla. 1989); *Lee v. Carlson,* 645 F.Supp. 1430, 1438–39 (S.D.N.Y.1986).