**UNITED STATES of America, Plaintiff,**

v.

**John CLARK, a/k/a Amwar, a/k/a Yahya; Eco Hernandez; Brenda Minor, a/k/a Debbie Baker, a/k/a Shirley Brown; Cynthia Barmont, a/k/a Cathy Adkins, a/k/a Lateefa; Robert Preston, a/k/a Balil; Ojetta Minor; Girard Thompson, a/k/a Sabir; Jose Saldana; Angelo Weeden, a/k/a Mukmen; Eugene Harris, a/k/a Nateem; and Naomi Harris, a/k/a Christine Johnson, Defendants.**

**Crim. Nos. 86–00075–01 to 86–00075–11.**

United States District Court,
M.D. Pennsylvania.

Oct. 9, 1986.

---

William J. Fulton, Harrisburg, Pa., for John Clark.

William A. Fetterhoff, Harrisburg, Pa., for Eco Hernandez.

Robert Tarman, Harrisburg, Pa., William DeStefano, Philadelphia, Pa. (court-appointed), for Brenda Minor.

Terrence J. McGowan, Harrisburg, Pa., Maureen Rowley, Asst. Defender, Philadelphia, Pa. (court-appointed), for Cynthia Barmont.

Todd A. Hoover, Harrisburg, Pa., for Robert Preston.

Spero T. Lappas, Harrisburg, Pa., for Ojetta Minor.

Gerald Robinson, Robinson & Geraldo, Harrisburg, Pa., for Girard Thompson.

Joseph J. Huss, III, Harrisburg, Pa., for Jose Saldana.

Richard F. Maffett, Harrisburg, Pa., for Eugene Harris.

Debra K. Wallet, Camp Hill, Pa., for Naomi Harris.

Fred Martin, Lewisburg, Pa., Timothy B. Haney, Harrisburg, Pa., for U.S.

## MEMORANDUM

RAMBO, District Judge.

*Background*

On April 17, 1986, the above-named defendants were indicted on thirty-five counts relating to the alleged introduction of marijuana into the Lewisburg Federal Penitentiary. Of the eleven defendants, six were inmates of the penitentiary at the time the indictment was filed. During the course of the investigation which preceded the Indictment, telephone conversations between the defendants who were inmates and others who were outside the penitentiary were recorded. The government plans to introduce several of these recordings as evidence in the upcoming trial. Before the court is the motion of all defendants to suppress the audio tapes. The motion has been fully briefed and is ripe for disposition.

The motion raises the following issues: (1) whether the recording of telephone conversations between inmates and non-inmates violates the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (hereinafter referred to as Title III); (2) whether the recording violated defendants' Fourth Amendment protection; (3) whether use of the tapes as evidence at trial would violate the common law husband-wife privileges; and (4) whether the tapes are of such poor quality that their use as evidence would be more prejudicial than probative. The court will address each of these issues.

*Discussion*

A. *Title III*

Title III, at 18 U.S.C. § 2511, generally provides that the interception of "any wire or oral communication" is prohibited. In § 2515, the Act further prohibits the use of illegally intercepted communications as evidence. Several exceptions to these rules are found throughout the Act. The two which are discussed in briefs are the law enforcement exclusion and the consent exclusion.

The consent exclusion is found at 18 U.S.C. § 2511(2)(c). According to that section, an interception of a communication is not illegal if "one of the parties to the communication has given prior consent to such interception." It is not necessary to decide here whether defendants consented to have their telephone conversations intercepted and recorded, because the issue of Title III violations can be answered in light of the law enforcement exclusion.

As noted by defendants, an exception from the coverage of Title III is found at 18 U.S.C. § 2510(5)(a)(ii) for "an investigative or law enforcement officer" who is using equipment for the interception of communications "in the ordinary course of his duties." An "investigative or law enforcement officer" is defined as,

> ... any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses ...

18 U.S.C. § 2510(7).

Defendants contend that the recordings at issue fail to qualify under the law enforcement exclusion for two reasons. First, defendants argue that prison employees do not qualify as investigative or law enforcement officers under the definition quoted above.[1]

---

**1.** Defendants assume that those who made the recordings were prison employees. The government does not dispute this and, in fact, alleges

that the recordings were made by Bureau of Prison officials. Therefore, for purposes of this

In *Crooker v. United States Department of Justice*, 497 F.Supp. 500 (D.Conn. 1980), the District Court of Connecticut addressed the issue of whether federal prison officials qualified as law enforcement officers. The court reasoned as follows:

It is beyond question that as a part of managing and regulating the day-to-day activities of a correctional institution, prison officials must be empowered to investigate potential criminal violations in order to preserve the security and orderly management of the institution; in fact, the Bureau of Prisons' regulations expressly provide specific procedures for investigating suspected criminal activity. 28 C.F.R. § 541.12(b). The Court finds, therefore, that defendants fall within the definition of 'investigative or law enforcement officer(s).'

*Id.* at 503.

■ The *Crooker* opinion is persuasive in the instant case. While prison employees may not be "the FBI or others normally recognized as law enforcement officers", Defendants' Brief at 5–6, the court finds that prison employees fall within the category of investigative officers as defined in 18 U.S.C. § 2510(7). Although prison employees may not be able to conduct investigations of offenses directly related to Title III, they are empowered by Bureau of Prison regulations to conduct investigations relating to prison security. This broad interpretation of the Title III definition of "investigative or law enforcement officer" is similar to an equally broad interpretation of that definition in *United States v. Iannelli*, 477 F.2d 999 (3d Cir.1973), *aff'd*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1970), where the Third Circuit Court found that "... Internal Revenue Service agents are investigative or law enforcement officers within the meaning of 18 U.S.C. § 2510(7) ..." *Id.* at 1001.

To qualify for the law enforcement exclusion under Title III, the interception of an oral communication must not only be conducted by an investigative or law enforcement officer, the interception must

also have been conducted in the ordinary course of the officer's duties. Defendants argue that the monitoring and taping of their telephone conversations was not performed in the ordinary course of duties.

In support of their position, defendants refer the court to *Campiti v. Walonis*, 611 F.2d 387 (1st Cir.1979). The plaintiffs in *Campiti* were two prisoners whose telephone conversation had been monitored by one of the defendants. The defendants were held liable to the plaintiffs for violations of Title III. On appeal, the defendants argued that the monitoring was routine and conducted pursuant to official duties. In rejecting this argument, the First Circuit Court found that the monitoring constituted an "... exceptional course of conduct ..." for the law enforcement officer involved. *Id.* at 392. The officer who performed the monitoring had never done so before. The court specifically declined to decide whether the monitoring would fall under the law enforcement exception if it had been conducted pursuant to established prison policy. *Id.* at 392, n. 4.

That issue was decided, however, in *United States v. Paul*, 614 F.2d 115 (6th Cir.1980), *cert. denied*, 466 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980). In *Paul*, telephone conversations between inmates and non-inmates were monitored, and their contents were used as evidence in convicting two defendants of bringing drugs into a federal prison. The Sixth Circuit Court ruled that the monitoring qualified for the law enforcement exclusion from Title III because the monitoring had taken place "... within the ordinary course of the Correctional Officers' duties ..." *Id.* at 117. The circumstances which supported this finding were that the monitoring was conducted pursuant to the policy of the Bureau of Prisons and local prison rules, the telephone rules were posted by the telephones and the inmates knew that monitoring took place. *Id.* at 117.

discussion, the court will also assume that prison employees made the recordings.

■ As the circumstances of the instant case are similar to those in *Paul*, the court will follow the holding in that case. Defendants attached to their supporting brief a document entitled "Institution Supplement" which outlines the penitentiary regulations regarding the use of the telephones. Paragraph 4(b) contains the following language:

> Inmates will receive written notification that telephone calls are both audible and visual monitored and recorded. There will be continuous monitoring of telephone calls, however, each inmate will be responsible for the content of the phone call he makes and will refrain from making threats, using obscene language, discussing escape plots, the introduction or exit of contraband, or any other violation of institutional rules and regulations.

Defendants' Brief, Exhibit B at 1.

The regulations of the Bureau of Prisons also contain guidelines for prisoners' use of telephones. 28 C.F.R. §§ 540.100–540.105. At § 540.101, the warden of a federal prison is directed to establish monitoring procedures in order "... to preserve the security and orderly management of the institution and to protect the public." The warden is also directed to notify inmates of potential monitoring. According to the Government's Brief in Opposition, defendants did have notice as there was a sign written in Spanish and English and posted by each penitentiary telephone which informed inmates that their conversations might be monitored.

The policies and procedures as outlined in the Institution Supplement, the Bureau of Prisons regulations and signs posted by penitentiary telephones, lead the court to find that the monitoring and recording which is in dispute was conducted in the "ordinary course of a Correctional Officer's duties." *Paul*, 614 F.2d at 117. This finding is not inconsistent with *Campiti* because the monitoring performed in that case was a unique occurrence.

Defendants argue in their responsive brief that the government's allegations concerning monitoring policy are not sufficient to show that the monitoring was done in "the ordinary course of duties." They argue that the notices by the telephones could be easily defaced or torn off. Defendants' Responsive Brief at 3. They also note that the government fails to allege when the signs were posted or whether defendants had specific knowledge of the monitoring policy. Defendants' Responsive Brief at 2. While these statements may be true, it is also true that there is no affidavit or allegation in defendants' briefs that defendants were *not* aware of the policy. There is no claim by defendants that the signs were posted after the investigation began or that the signs had been destroyed in some way. Defendants merely raise a conjecture that those things could have happened, and such conjecture does not necessitate the evidentiary hearing which defendants have requested.

Having found that the government has satisfied both elements of the law enforcement exclusion from Title III, *i.e.*, that prison officials qualify as investigative or law enforcement officers and that the monitoring was conducted pursuant to an "ordinary course of duties", the court concludes that Title III does not apply to the monitoring of defendants' telephone conversations.

### B. *Fourth Amendment*

■ "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable', a 'reasonable', or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Thus, to determine whether the monitoring and recording of defendants' phone calls constituted an unreasonable search and seizure, it must be decided whether defendants had a reasonable expectation of privacy during conversations placed from penitentiary telephones.

Defendants rely upon *United States v. Chamorro*, 687 F.2d 1 (1st Cir.1982), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982), for the proposition that

inmates retain "... some residuum of Fourth Amendment protection." *Id.* at 4. Although the First Circuit Court made that ruling, it declined to define the scope of Fourth Amendment protection in a penitentiary, finding that the scope must be determined on a case-by-case basis. *Id.* at 4. Perhaps one reason why the *Chamorro* court was reluctant to define the scope of protection was that the United States Supreme Court had not yet decided "... whether and to what extent an inmate's privacy interest in his cell is protected by the Fourth Amendment." *Id.* at 3.

Since *Chamorro*, the Supreme Court has addressed that issue. In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court held that a prisoner has no legitimate expectation of privacy in his prison cell which warrants Fourth Amendment protection from unreasonable searches and seizures. *Id.* at 526, 104 S.Ct. at 3200. The basis for this holding seems to be a recognition by the Supreme Court of the security problems in penitentiaries and the need for prison officials to be able to take whatever steps are necessary to preserve safety in prisons. For instance, the Court noted that prison officials "... must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today ..." *Id.* at 527, 104 S.Ct. at 3200.

■ While the holding in *Hudson* may be limited to a prisoner's expectation of privacy in his cell, the reasoning in *Hudson* can be applied to this case. The recognition by the court of a reasonable expectation of privacy in telephone conversations placed from penitentiary telephones would frustrate the objectives of the Bureau of Prisons, as set forth at 28 C.F.R. §§ 540.-100–540.105.[2] It is clear in those regulations that it is the aim of the Bureau of Prisons to enhance the security of federal prisons through monitoring and recording of telephone conversations. The fact that the inmates are made aware of this policy through the signs posted by the telephones is even more reason not to find a legitimate expectation of privacy.

Defendants have drawn the court's attention to the case of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in which the Supreme Court held that the recording of telephone conversations placed from a public telephone violated the petitioner's Fourth Amendment protection. In reaching that decision, the Court found that "[o]ne who occupies [a phone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast into the world." *Id.* at 352, 88 S.Ct. at 511.

The court's finding in the instant case does not conflict with *Katz*. The expectation of privacy which *Katz* attributed to the user of a public telephone booth does not carry over to the user of a penitentiary telephone. Therefore, the *Katz* holding does not compel the court to find that the monitoring and recording of defendants' conversations constituted an unreasonable search and seizure.

## C. Husband-Wife Immunity

■ Defendants argue that the use of the tape recordings of the married defendants' conversations as evidence would violate the husband-wife privilege which is recognized at common law and therefore by F.R.E. 501.[3] There are two distinct aspects of the husband-wife privilege. The first is that a spouse may not be compelled to testify against the other spouse. This aspect of the privilege may be waived by the testifying spouse, in whose control the privilege rests. The second aspect is that

---

2. The court recognizes that the Bureau of Prisons regulations do allow for one type of private telephone conversation using penitentiary telephones. At 28 C.F.R. § 540.101, the regulations prohibit the monitoring of a properly placed call to an inmate's attorney.

3. Among the eleven defendants there are apparently two married couples: Naomi and Eugene Harris, and John Clark and Brenda Minor.

confidential communications between spouses are privileged from disclosure at trial. *United States v. Ammar*, 714 F.2d 238, 258 (3d Cir.1983).

As to the first aspect of the privilege, defendants claim that the introduction at trial of the tapes of conversation between spouses is the same as compelling one spouse to testify against another. The only case to which defendants refer in support of that proposition is *Hunter v. Hunter*, 169 Pa.Super. 498, 83 A.2d 401 (1951). In *Hunter*, the Pennsylvania Superior Court held that surreptitiously recorded conversations between a husband and his wife would not be admitted as evidence in a divorce proceeding because the conversations which were recorded were confidential. The Superior Court did not find that admission of the tapes would be the same as compelling one spouse to testify against the other. Rather, the basis of the holding was the second aspect of the husband-wife privilege, which forbids disclosure of confidential communications. Thus, *Hunter* is inapposite here. *See, United States v. Geller*, 560 F.Supp. 1309, 1326 (E.D.Pa.1983), aff'd, 745 F.2d 49 (3d Cir.1984), cert. denied, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

■ Defendants do not cite any other cases in support of their position. Additionally, it is the opinion of this court that the tape recordings at issue are evidentiary, rather than testimonial, in nature. Therefore, the court finds that their introduction will not constitute the compulsion of a witness to testify against his or her spouse.

As to the second aspect of the husband-wife privilege, the court notes that the conversations which the government plans to introduce as evidence allegedly relate to the conspiracy with which all defendants are charged. The Third Circuit Court has specifically ruled that " . . . communications between spouses pertaining to ongoing or future criminal activity, are not protected

against disclosure by the privilege for confidential marital communications." *United States v. Ammar*, 714 F.2d 238, 258 (3d Cir.1983), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Compelled by this clear ruling, the court must take a position contrary to the one taken in *United States v. Geller, supra.*

■ In *Geller*, the District Court for the Eastern District of Pennsylvania ordered that tapes of conversations between two defendants who were married would be suppressed in a criminal trial involving the couple. The court's order was based on a finding that the Third Circuit Court, in the case of *Appeal of Malfitano*, 633 F.2d 276 (3d Cir.1980), had ruled that conspiratorial utterings between spouses are privileged. *Geller*, 560 F.Supp. at 1327. While *Malfitano* does say that a spouse-conspirator cannot be compelled to testify against her husband, *Malfitano*, 633 F.2d at 280, this court is unable to find any language in that case which indicates that conversations between spouses are privileged from disclosure despite their involvement in a conspiracy. In other words, *Malfitano* does not address the second aspect of the husband-wife privilege. *See, Malfitano*, 633 F.2d at 277, n. 2; and *Ammar*, 714 F.2d at 258. Thus, *Geller* is not persuasive, and the court finds that under the holding in *Ammar* the confidential communications privilege does not warrant the suppression of the tape recordings of conversations between the four married defendants.

### D. *Quality*

■ Defendants argue that because the tape recordings are at times "inaudible, unintelligible and incomplete", their introduction as evidence would create undue prejudice. In order to consider this argument of defendants more carefully, the court listened to one of the tapes.[4] It is the opinion of the court that the quality of the tape recordings are not so poor as to

---

**4.** Pursuant to the request of the court, defense counsel and government counsel agreed on a tape which was representative of the quality of all the tapes. It was this tape to which the court listened.

warrant their suppression. As to the possibility of incompleteness or errors in the transcripts which accompany the tapes, the court will instruct the jury that the transcripts have been provided only to assist the aural comprehension of the tapes and that where the transcripts differ from what the jury hears, the jurors are to be "governed" by what they hear. *United States v. Ruppel,* 666 F.2d 261, 272 (5th Cir.1982), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982), *reh'g denied,* 458 U.S. 1132, 103 S.Ct. 17, 73 L.Ed.2d 1402 (1982).

*Conclusion*

On the basis of the preceding discussion, the defendants' Motion to Suppress the Audio Tapes of their telephone conversations has been denied.[5]

---

5. *See,* Order of October 3, 1986.