# Bureau of Prisons Disclosure of Recorded Inmate Telephone Conversations

The policy of the Criminal Division requiring outside law enforcement officials to obtain some form of legal process authorizing access to contents of inmate telephone conversations is not mandated by the Constitution or Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

The practice of profiling specific groups of inmates for monitoring raises concerns when it requires or causes the Bureau of Prisons to alter its established monitoring procedures for purposes unrelated to prison security or administration.

Inmates have a First Amendment right to some minimum level of telephone access, subject to reasonable restrictions related to prison security and administration. Under certain circumstances they also may have a Sixth Amendment right to make telephone calls to their attorneys

January 14, 1997

MEMORANDUM OPINION FOR THE ACTING ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

You have requested our views on the extent to which Bureau of Prisons ("BOP") officials may disclose tape recordings of non-privileged inmate telephone conversations to other law enforcement officials to assist in criminal investigations unrelated to prison security or administration.[1] In addition, you have asked for our views on the legal necessity of the Department of Justice's current policy regarding access by non-BOP law enforcement officials to such tapes.[2]

At the outset, we believe it is helpful to distinguish several questions raised by your memorandum. The first question is the extent to which BOP officials may take tape recordings made for prison security and administration purposes and disclose their contents to outside law enforcement officials for reasons unrelated to institutional purposes. We understand this question to encompass the related issues whether outside law enforcement officials may obtain this same information by participating in routine prison monitoring and whether those officials must seek legal process prior to obtaining the information, as required by the Department's current policy. A second question is the extent to which BOP may monitor and record (and thereafter, disclose) inmate telephone conversations for reasons unrelated to prison security and administration. Finally, there is a question whether inmates have a constitutional or other legal right to telephone privi-

---

[1] Memorandum for Christopher Schroeder, Acting Assistant Attorney General, Office of Legal Counsel, from John C Keeney, Acting Assistant Attorney General, Criminal Division, Re Request for an Opinion Regarding the Legality of the Disclosure by Bureau of Prison Officials, Acting Without Court Process, of Monitored/Recorded Non-Privileged Inmate Telephone Conversations to Law Enforcement to Assist in Criminal Investigations Unrelated to Prison Security or Administration (Oct 11, 1996) ("Keeney Memorandum")

[2] Id

11

leges while incarcerated. We address each of these questions after setting forth some basic background principles that guide the analysis.[3]

## BACKGROUND

As a general matter, the interception of wire communications is governed by two sources of law: the Fourth Amendment[4] and the federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), Pub. L. No. 90–351, 82 Stat. 197, 211–225, *amended by* the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510–2522 (1994). The Supreme Court has not addressed the applicability of the Fourth Amendment or Title III to the practice of monitoring and recording inmate telephone conversations to ensure prison security and orderly administration. Many lower courts have addressed the issue, agreeing that neither poses an obstacle to the practice. These courts, however, have provided little analysis with respect to the Fourth Amendment and have diverged in their analyses with respect to Title III. *See* Attachment I to Keeney Memorandum (collecting cases). Because we believe that the particular analysis that is controlling may affect the answers to your questions, we lay out the proper approaches below.

### I. Fourth Amendment

The Fourth Amendment protects individuals from "unreasonable searches." U.S. Const. amend. IV. The applicability of the Fourth Amendment in a particular case turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). This inquiry, in turn, requires both an " 'actual (subjective) expectation of privacy' " and one that, viewed objectively, " 'society is prepared to recognize as "reasonable." ' " *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

In *Hudson v. Palmer*, 468 U.S. 517, 530 (1984), the Supreme Court held that "the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." In that case, a prison inmate brought a § 1983 action, *see* 42 U.S.C. § 1983 (1994), alleging that prison officials had conducted a random, unannounced "shakedown" of his cell solely to harass him. The Court rejected his claim, holding that prison inmates have no legitimate expectation of privacy in

---

[3] We respectfully decline to answer your question concerning the extent to which an inmate's recorded conversations constitute Jencks Act or *Brady* material in the main because that question is the subject of ongoing litigation. *See* Keeney Memorandum at 5

[4] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized " U.S. Const. amend. IV.

their cells. 468 U.S. at 530. Although the Court observed that prisoners retain certain constitutional rights while incarcerated, it reasoned that an expectation of privacy in the contents of a prison cell is incompatible with ''what must be considered the paramount interest [of the prison] in institutional security.'' *Id.* at 528. This interest is so compelling, the Court found, that it justifies categorical treatment of cell searches. Thus, given the complete absence of any legitimate expectation of privacy, even when a particular cell search is conducted for ''calculated harassment unrelated to prison needs,'' the Fourth Amendment provides no protection. *Id.* at 530.[5]

Although *Hudson* concerned the applicability of the Fourth Amendment to prison cells, we believe its reasoning applies with full force to inmate telephone conversations. As in Hudson, recognizing an expectation of privacy in inmate telephone conversations would conflict with the objectives of prison officials. *See United States v. Clark*, 651 F. Supp. 76, 81 (M.D. Pa. 1986) (recognition of a reasonable expectation of privacy would frustrate BOP objectives ''to enhance the security of federal prisons through monitoring and recording of telephone conversations''), *aff'd sub. nom. United States v. Weeden,* 869 F.2d 592 (3d Cir.), *cert. denied,* 490 U.S. 1073 (1989); *United States v. Van Poyck,* 77 F.3d 285, 291 (9th Cir.), *cert. denied,* 519 U.S. 912 (1996). Inmates may use their telephone privileges in a variety of ways that violate prison regulations and threaten prison security. For example, they may request illegal drugs or weapons from the outside; they may plan prison escapes; they may relate information concerning illegal activities within the prison; they may facilitate illegal activities outside of the prison. The prison's interest in detecting and preventing this type of conduct outweighs any expectation of privacy inmates might have in their telephone conversations.

Furthermore, we believe inmates lack a credible claim of privacy with respect to their telephone conversations because they receive ample notice of the monitoring and taping practice. BOP, for example, posts notices of its monitoring system in English and Spanish on each inmate telephone and requires inmates to sign forms acknowledging their awareness of the system. In addition, public notice of the system is contained in the Code of Federal Regulations. 28 C.F.R. §§ 540.100–540.101 (1996). Under these circumstances, it would be difficult for inmates to argue that they have an actual expectation of privacy. *See United States v. Amen,* 831 F.2d 373, 379–80 (2d Cir. 1987), *cert. denied,* 485 U.S. 1021 (1988).[6] Even if inmates nonetheless subjectively expected their telephone con-

---

[5] In such a case, however, the Court stated that a prisoner may pursue claims under the Eighth Amendment or state tort and common-law remedies. *Hudson,* 468 U.S. at 530

[6] Indeed, it could be argued that inmates expressly or impliedly consent to have their telephone conversations monitored and recorded. *See Amen,* 831 F.2d at 379, *Van Poyck,* 77 F 3d at 291. Consent — whether express of implied — would render the prison's monitoring procedure lawful, even if it constituted a search *See Schneckloth v. Bustamonte,* 412 U S. 218, 219 (1973) (consent is ''one of the specifically established exceptions to the requirements of both a warrant and probable cause''); *McGann v Northeast Ill. Regional Commuter R R Corp.,* 8 F.3d

Continued

versations to remain private, we believe that expectation would not be "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361. "If security concerns can justify strip and body cavity searches and wholly random cell searches, then surely it is reasonable to monitor prisoners' telephone conversations, particularly where they are told that the conversations are being monitored." *Amen*, 831 F.2d at 379–80 (citations omitted). But even if inmates possessed a subjectively and objectively reasonable expectation of privacy in their telephone conversations, we believe that monitoring such conversations would be "reasonable" in light of the prison's compelling interest in security and orderly administration so long as the monitoring was conducted consistent with that purpose. *See Van Poyck*, 77 F.3d at 291.

## II. Title III

Title III generally prohibits the use of any "electronic, mechanical, or other device" to intercept "any wire, oral, or electronic communication," in the absence of authorization by a court order. 18 U.S.C. § 2511(a), (b) (1994).[7] The statute provides several exceptions to this general prohibition, however. For example, it permits interception of oral communications uttered by a person with no justifiable expectation of privacy. *See* 18 U.S.C. § 2510(2). Interception of wire communications — the type of communications at issue here — does not similarly turn on expectation of privacy. Rather, Title III contains specific conditions under which interception of such communications is permissible. Section 2510(5)(a), for example, permits interception of wire communications by "an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a) ("ordinary course of duties exception").[8] Section 2511(1)(c) permits interception upon consent from a party to the communication. *Id.* § 2511(1)(c) ("consent exception").[9] Courts have held that one or both of these exceptions apply to monitoring and recording of inmate telephone conversations.

To qualify for the ordinary course of duties exception to Title III, interception of a wire communication must be conducted (1) by an investigative or law enforcement officer (2) in the ordinary course of his duties. Courts generally have

---

1174, 1181 (7th Cir. 1993) (reviewing factors establishing implied consent, including whether "the person searched was on notice that undertaking certain conduct . . . would subject him to a search"). As discussed *infra* in the Title III context, several courts have questioned whether consent based solely on notice is valid.

[7] It is well settled that Title III applies to the prison system. *See Van Poyck*, 77 F.3d at 291; *Amen*, 831 F.2d at 377; *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.), *cert. denied*, 446 U.S. 941 (1980); *Campiti v. Walonis*, 611 F.2d 387, 392 (1st Cir. 1979).

[8] Section 2510(5)(a) does so by excluding from the definition of "electronic, mechanical, or other device" equipment used by "an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a). Investigative officers using an electronic, mechanical, or other device in the ordinary course of duties may intercept any wire, oral, or electronic communication

[9] Such consent may be express or implied. *See United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir. 1988) (citing S. Rep. No. 90-1097, at 94 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2182), *cert. denied*, 488 U.S. 1033 (1989).

assumed that prison officials constitute "law enforcement" officers.[10] The "ordinary course of duties" requirement has engendered more discussion. Courts have concluded that prison monitoring occurs in the ordinary course of duties if conducted pursuant to an established policy that is related to institutional security, generally applicable rather than directed at a particular inmate, and made known to inmates.[11] We agree that a prison monitoring program will not violate Title III if it exhibits these characteristics.

Many courts have gone considerably further, holding that prison monitoring is exempt under Title III if inmates merely have notice of its occurrence. These courts imply consent under § 2511(1)(c) from circumstances suggesting that inmates voluntarily choose to make telephone calls with knowledge that they will be tape recorded.[12] Other courts have rejected or criticized this application of § 2511(1)(c). Some reason that consent to monitoring is not voluntary because inmates have no choice but to forego telephone privileges.[13] Others frame the problem as a failure to distinguish between knowledge and implied consent.[14] As Judge Posner has stated:

> [K]nowledge and consent are not synonyms. Taking a risk [that prison officials will not detect an abuse of telephone privileges] is not the same thing as consenting to the consequences if the risk materializes. A person who walks by himself late at night in a dangerous neighborhood takes a risk of being robbed; he does not consent to being robbed. We would be surprised at the argument that

---

[10] An "[i]nvestigative or law enforcement officer" is defined as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter " 18 U S C § 2510(7). Although prison officials are not empowered to conduct investigations of offenses directly related to Title III, they have authority to conduct investigations relating to prison security *See* 28 C F R § 541 14(b) (1996) Courts have found such authority sufficient for Title III purposes *See, e.g., Clark,* 651 F Supp at 78–79, *Crooker v United States Dept of Justice,* 497 F. Supp 500, 503 (D. Conn. 1980)

[11] *See, e.g. United States v Lanoue,* 71 F.3d 966, 982 (1st Cir. 1995) ("If the call was intercepted to gather evidence for Agent Brosnan's investigation, rather than for prison security purposes, it was not done in the ordinary course of duty "), *Paul,* 614 F.2d at 117 (monitoring in ordinary course of duties where conducted pursuant to the policy of the BOP and local prison rules that were posted by each telephone), *Campiti,* 611 F 2d at 390–92 (monitoring not in ordinary course of duties where unrelated to prison security, not pursuant to prison policy, without notice to inmates, and focused on one inmate); *United States v Green,* 842 F Supp 68, 73–74 (W.D.N Y. 1994) ("These facts, including the focus on the calls of one particular prisoner, the extraordinary long time period in which the taping continued, and the large volume of tapes sent to other investigative agencies, all contrast starkly with prior cases in which a few calls were taped in the course of routine monitoring."), *aff'd sub nom United States v. Workman,* 80 F.3d 688 (2d Cir ), *cert denied,* 519 U S 955 (1996), *United States v. Cheely,* 814 F Supp 1430, 1442–43 (D Alaska 1992) (defining "ordinary course of duties" to exclude "ad hoc monitoring of a single inmate" and distinguishing *Campiti*), *aff'd,* 36 F 3d 1438 (9th Cir. 1994); *Clark,* 651 F Supp at 79–80 (*same*), *United States v Noriega,* 764 F Supp 1480, 1491 (D. Fla. 1991) ("If in fact the interception of Noriega's conversations was unrelated to any institutional considerations, then it would fall outside the scope of an MCC official's 'ordinary course of duties.' ")

[12] *United States v Workman,* 80 F 3d 688, 693 (2d Cir ), *cert denied.* 519 U S 955 (1996), *Van Poyck,* 77 F 3d at 291, *United States v Horr,* 963 F 2d 1124, 1126 (8th Cir ), *cert denied,* 506 U S 848 (1992), *Willoughby,* 860 F 2d at 20, *Amen,* 831 F.2d at 378; *Green,* 842 F Supp at 72

[13] *See Langton v Hogan,* 71 F 3d 930, 936 (1st Cir 1995)

[14] *United States v Daniels,* 902 F 2d 1238, 1245 (7th Cir ) (Posner, J ), *cert. denied,* 498 U S 981 (1990), *Cheely,* 814 F Supp. at 1443; *Crooker,* 497 F. Supp at 503

> if illegal wiretapping were widespread anyone who used a phone would have consented to its being tapped and would therefore be debarred from complaining of the illegality.

*United States v. Daniels*, 902 F.2d at 1245.

Although we believe Judge Posner's analogy inapt, equating assumption of a risk with knowledge for the purpose of distinguishing voluntary consent, we do agree that, in certain circumstances, construing or equating knowledge as implied consent would allow the government to evade the requirements of Title III (and the Fourth Amendment) simply by announcing its intention to do so. We further appreciate without necessarily conceding that such circumstances may arise in the prison setting, on the theory that inmates have no alternative comparable to telephone facilities and thus no choice but acquiescence with respect to wiretapping. We therefore have reservations about reliance on the consent exception to Title III to monitoring of inmate telephone conversations based solely on evidence of notice. Nonetheless, we include this theory in our discussion below because it remains valid in several jurisdictions.

## DISCUSSION

### I. Monitoring for Purposes of Prison Security and Administration

In this section, we address issues related to BOP's practice of monitoring and recording inmate telephone conversations pursuant to established policy and for reasons related to prison security or administration. We address each issue under the applicable Fourth Amendment and Title III standards.

### A. Disclosure for Purposes Unrelated to Prison Security

Because we believe inmates have no legitimate expectation of privacy in their telephone conversations, the seizure of those conversations by BOP officials (through routine monitoring and recording) does not implicate the Fourth Amendment. As a result, the subsequent disposition of those conversations does not implicate the Fourth Amendment. *Cf. Hudson*, 468 U.S. at 538–39 (O'Connor, J., concurring) ("[I]f the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth Amendment concern."). Thus, the Fourth Amendment does not prevent BOP officials from disclosing the contents of those conversations to outside law enforcement officials, even for purposes unrelated to prison security or administration.

Although Title III may impose greater constraints than the Fourth Amendment on the interception of wire communications, it furnishes no greater barrier to their disclosure in this instance. Title III expressly authorizes law enforcement officers

to disclose the contents of lawfully obtained communications to "another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." 18 U.S.C. § 2517(1). In addition, Title III permits law enforcement officers to use the contents of lawfully obtained communications "to the extent such use is appropriate to the proper performance of his official duties." *Id.* § 2517(2).[15] We believe that either or both of these provisions permits BOP to disclose the contents of inmate telephone conversations to other law enforcement officials consistent with statutory limitations.

## B. Participation of Non-BOP Law Enforcement Officials

From a Fourth Amendment perspective, the presence of outside law enforcement officials during taping is indistinguishable from disclosure thereafter.[16] Because inmates have no reasonable expectation of privacy in their telephone calls, the Fourth Amendment simply has nothing to say about the circumstances under which, or even the manner in which, the BOP seizes those conversations. Cf. Hudson, 468 U.S. at 529 (Fourth Amendment provides no protection for destruction of property during the course of lawful prison cell search). Thus, we believe that the Fourth Amendment does not prevent outside law enforcement officials from participating in routine prison monitoring and recording.[17]

In our view, Title III presents a more complicated question. Unlike the Fourth Amendment, the ordinary course of duties exception to Title III requires courts to consider the circumstances under which monitoring occurs. Under certain conditions, the unannounced or sporadic presence of outside law enforcement officials might indicate a course of conduct out of the ordinary. *Cf. United States v. Green*, 842 F. Supp. at 73 (dicta) (monitoring not in ordinary course of duties where, among other things, special arrangements for recording were set up and prison officials sent an unusually large volume of tapes to outside investigative agencies). As a general matter, however, we do not believe that the presence of outside law enforcement officials — in the absence of other unusual circumstances — is sufficient to call into question otherwise routine monitoring. Nor is it enough in our view, to vitiate implied consent to monitoring, particularly where inmates have

---

[15] Inmates have argued that disclosure to other law enforcement officials renders the initial monitoring unlawful under Title III, such that neither § 2517(1) nor § 2517(2) applies. Specifically, inmates have claimed that disclosure takes the initial seizure outside the ordinary course of duties. For the reasons discussed *infra* citing *Green*, we do not believe, however, that disclosure to outside law enforcement officials — absent other peculiar circumstances — is sufficient to taint otherwise routine monitoring and recording. Inmates also have argued that disclosure to other law enforcement officials exceeds the scope of their implied consent to monitoring. In *Noriega*, the court flatly rejected this argument, reasoning that Title III treats issues of consent and disclosure separately. 764 F. Supp. at 1491.

[16] For purposes of this discussion, we assume that the presence or participation of outside law enforcement officials is not so significant as to change the routine and established nature of the monitoring.

[17] Although the Eighth Amendment "always stands as a protection against 'cruel and unusual punishments,'" *Hudson*, 468 U S at 530, we do not believe that the presence of outside law enforcement officials during routine monitoring rises to that level.

notice of the periodic presence of outside law enforcement personnel. Even when inmates have no notice of the precise conditions under which monitoring occurs, their consent to the practice of monitoring remains valid and sufficient for Title III purposes. *Cf. Workman*, 80 F.3d at 694 (consent to monitoring valid even though inmates had no notice that their calls were recorded).

## C. The Extent to Which Court Process is Required

We understand that the Criminal Division has voluntarily adopted a policy requiring outside law enforcement officials to obtain some form of legal process authorizing access to the contents of inmate telephone conversations.[18] With respect to previously recorded communications of a specifically identified inmate, the policy requires the requesting agency to obtain a search warrant, grand jury subpoena, administrative summons, or national security letter.[19] For future telephone conversations, the policy requires a Title III interception order from the courts.[20]

We do not believe that the policy of the Criminal Division is either constitutionally or statutorily mandated. As discussed above, neither the Fourth Amendment nor Title III limits or otherwise conditions disclosure to outside law enforcement officials. While the Criminal Division or BOP may voluntarily adopt procedural restrictions as a policy matter, they are not compelled by law to do so. Thus, the Criminal Division is free to modify or repeal its current policy.

## II. Monitoring Unrelated to Prison Security and Administration

In this section, we address whether non-BOP law enforcement agencies may "profile" specific groups of inmates for BOP to monitor and record. It is our understanding that these profiles may enable non-BOP law enforcement agencies to prevent inmates from using their telephone privileges to facilitate criminal activities outside the institution and to gather information concerning the outside criminal activities themselves.

We believe the practice of profiling raises concerns only to the extent it requires or causes BOP to alter its established monitoring procedures. BOP has authority to monitor and record all inmate telephone conversations for institutional purposes. As discussed above, those conversations, once lawfully obtained, may be used for purposes unrelated to prison security and administration. If profiling merely enables outside law enforcement agencies to identify potentially useful inmate telephone conversations before they are lawfully seized, it is no more problematic

---

[18] *See* Memorandum for All United States Attorneys and Strike Force Chiefs, from William F. Weld, Assistant Attorney General, Criminal Division, *Re Electronic Surveillance Procedures Within the Federal Prison System* (Jan 9, 1987) (attaching guidelines).

[19] *Id*

[20] *Id.*

than allowing those officers to participate during the seizure or disclosing the tapes to them thereafter.

If profiling requires or causes BOP either to adopt special monitoring procedures or change its monitoring policy for purposes unrelated to prison security or administration, however, it may jeopardize the application of the ordinary course of duties exception. In *Green*, the court held that monitoring was not in the ordinary course of duties for purposes of Title III where focused on a particular inmate and recorded on special audio cassettes, rather than reel-to-reel tapes. 842 F. Supp. at 73; *see also Campiti*, 611 F.2d at 390–92 (monitoring not in ordinary course of duties where directed at a specific inmate for reasons unrelated to prison security and conducted without notice or regard to prison policy).[21] Similarly, if a prison that maintained a general policy of random monitoring (or random screening of monitored calls) decided to monitor or review all telephone conversations of certain inmates at the behest of outside law enforcement officers, a court might find the monitoring beyond the ordinary course of duties. Such a finding would be fatal in jurisdictions that reject the implied consent theory of monitoring.

Even in jurisdictions that accept the implied consent theory, however, the practice of targeting inmates for reasons unrelated to prison security raises troubling issues. For example, inmates who receive express notice of random monitoring (or random screening of monitored calls) might argue that their consent does not extend to the unwritten practice of monitoring or review *all* of their telephone conversations. To the extent inmates have been misled or deceived with respect to prison policy, a court might refuse to find implied consent.

### III. Constitutional Right to Telephone Privileges

In this section, we discuss the extent to which the Constitution requires prisons to provide inmates with access to telephones. We believe that inmates have a First Amendment right to some minimal level of telephone access, subject to reasonable restrictions related to prison security and administration. Under certain circumstances, they also may have a Sixth Amendment right to make telephone calls to their attorneys, subject again to reasonable restrictions.[22]

The Supreme Court has recognized that " '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,' . . . nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.' " *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)

---

[21] *See also Cheely*, 814 F Supp at 1441 ("ad hoc monitoring" of particular inmates is beyond ordinary course of duties), *Lanoue*, 71 F.3d at 982 ("If the call was intercepted to gather evidence for Agent Brosnan's investigation, rather than for prison security purposes, it was not done in the ordinary course of duty."), *Noriega*, 764 F. Supp at 1491 ("If in fact the interception of Noriega's conversations was unrelated to any institutional considerations, then it would fall outside the scope of an MCC official's 'ordinary course of duties.'").

[22] At least one court has held that inmates have no Eighth Amendment claim to telephone access because it is not a basic human need, such as food, medical care, and physical safety. *See Douglas v DeBruyn*, 936 F Supp. 572, 578 (S D. Ind 1996)

(quoting *Turner v. Safley*, 482 U.S. 78, 84, 94–99 (1987)). Thus, "a prison inmate retains those [consititutional] rights that are not inconsistent with his status as a prisoner [and] with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). With respect to telephone privileges, courts generally agree that inmates have a First Amendment right to some minimal level of access.[23] Although courts have not reached consensus on the precise level of access required,[24] the touchstone is reasonableness.[25] Thus, limitations on the right to telephone access will not violate the First Amendment if they are reasonable.[26] We acknowledge, however, that certain bases exist that justify a complete ban on telephone access by a particular inmate or a class of inmates, consistent with the First Amendment. *See* 28 C.F.R. § 501.2 (1996) (upon direction of Attorney General, Director of BOP may authorize Warden to limit telephone use as reasonably necessary to prevent the disclosure of classified information); *id.* § 501.3 (upon direction of Attorney General, Director of BOP may authorize Warden to limit telephone use as reasonably necessary to protect persons against the risk of acts of violence or terrorism). There may be other circumstances as well that support a similar revocation of telephone privileges.

In addition to the First Amendment, the Sixth Amendment may guarantee inmates a right to some telephone contact with their attorneys.[27] Even this right is not unlimited, however.[28] A prison need only provide access to counsel that is "adequate, effective, and meaningful when viewed as a whole." *Aswegan*, 981 F.2d at 314.[29] Thus, reasonable restrictions on access to attorney telephone calls are permissible, especially when other means of attorney contact are available.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[23] *See Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996); *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994); *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir 1991), *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986); *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir 1975); *Montana v. Commissioners Court*, 659 F.2d 19, 23 (5th Cir. 1981), *cert. denied*, 455 U S 1026 (1982), *Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir. 1978); *Johnson v. Galli*, 596 F. Supp. 135, 138 (D. Nev. 1984). This is true even though other forms of communication with the outside exit. *Cf Pell v Procunier*, 417 U.S. 817 (upholding prison regulations prohibiting face-to-face interviews by media of individual inmates because alternative means of communication existed).

[24] *See Wooden v Norris*, 637 F. Supp 543, 555 n.4 (M.D. Tenn. 1986) (collecting cases).

[25] *See Pope*, 101 F.3d at 1384 ("[W]hen a prison regulation impinges upon an inmate's constitutional rights, the regulation is valid if reasonably related to legitimate penological interests.") (citing *Turner*, 482 U.S. at 89), *Washington*, 35 F 3d at 1100 (prisoner's right to telephone access is "'subject to rational limitations in the face of legitimate security interests of the penal institution'"); *Strandberg*, 791 F.2d at 747

[26] *See Washington*, 35 F.3d at 1099; *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir.), cert. denied, 493 U.S. 895 (1989); *Strandberg*, 791 F 2d at 747; *Lopez v. Reyes*, 692 F 2d 15, 17 (5th Cir 1982); *Carter v. O'Sullivan*, 924 F. Supp. 903, 909 (C.D. Ill. 1996).

[27] *See Tucker*, 948 F.2d at 391; *Strandberg*, 791 F.2d at 747; *Carter*, 924 F. Supp. at 909

[28] *See Aswegan v Henry*, 981 F.2d 313, 314 (8th Cir. 1992) ("Although prisoners have a constitutional right of meaningful access to the courts, prisoners do not have a right to any particular means of access, including unlimited telephone use.") (citing *Bounds v. Smith*, 430 U.S. 817, 823, 832 (1977)).

[29] *See also Wooden*, 637 F Supp. at 554–55 (coinless telephone system does not violate First or Sixth Amendment rights of inmates or First Amendment rights of inmates' families).